JOHN S. BUGAS and The Estate of MARGARET S. BUGAS, Deceased, JOHN S. BUGAS, Co-Executor, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bugas v. Commissioner
Docket No. 1593-73.
United States Tax Court
T.C. Memo 1976-21; 1976 Tax Ct. Memo LEXIS 383; 35 T.C.M. (CCH) 76; T.C.M. (RIA) 760021; January 27, 1976, Filed Theodore Souris, for the petitioners. James C. Lynch, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent has determined deficiencies in petitioners' Federal income taxes for the taxable years 1968 and 1969 in the amounts of $9,352 and $30,469, respectively. The sole issue for decision is whether petitioners are entitled to a bad debt deduction under the provisions of section 166(f). [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner John S. Bugas was a resident of Bloomfield Hills, Michigan at the time the petition was filed in this case. *384 John S. Bugas and Margaret S. Bugas, his wife, filed joint income tax returns for the year ended December 31, 1968 with the district director of internal revenue, Detroit, Michigan and for the year ended December 31, 1969 with the internal revenue service center in Cincinnati, Ohio. Margaret S. Bugas died in 1972. Her estate was administered and closed and John S. Bugas, executor of the estate has been discharged. Hereafter, John S. Bugas will be referred to as the petitioner. In 1959, petitioner's brother, Russell Bugas, (Russell) purchased a one-half interest in The Mills Company, a Colorado partnership engaged primarily in the commercial sheet metal contracting business. Russell and Clifton W. Mills operated The Mills Company as a partnership in which each had an equal interest as sole partners from April 1, 1959 until June 1, 1961, at which time the business was incorporated. On July 31, 1965 Russell purchased the interest of Clifton W. Mills and became the sole stockholder of the corporation. [2]
*385 From 1960 to 1963, petitioner on four separate occasions guaranteed loans made by the First National Bank of Longmont, Colorado to The Mills Company. In making these guarantees, petitioner used the following language: In consideration of your granting a loan of * * * [amount] for one year with interest at 6% to the Mills Company, with my brother, Russell Lee Bugas, and Mr. Mills, partners, as co-signers on the promissory note evidencing such loan, I hereby guarantee payment in full thereof at maturity date or any extension thereof to which I agree at the time of said extension. Late in 1963, The Mills Company established banking relations with the Poudre Valley National Bank of Fort Collins, Colorado (Poudre Valley). In December of that year, The Mills Company secured a loan from Poudre Valley in the amount of $44,750 which was used to repay an obligation to the Longmont Bank. This loan was also guaranteed by petitioner. The Mills Company borrowed additional amounts from Poudre Valley in the course of its business, and in November of 1964, a five-year promissory note (1964 note) was executed to reflect the current $150,000 balance due. The 1964 note appeared in the following *386 form: Fort Collins, Colorado, November 13, 1964. November 13, 1969 After Date, I/We or either of us Promise to Pay to the Order of THE POUDRE VALLEY NATIONAL BANK, One Hundred Fifty Thousand and 00/100---Dollars. * * * THE MILLS COMPANY, INC. By /s/ Clifton W. Mills, Pres. By /s/ Russell L. Bugas, V.P. The proceeds of the $150,000 loan were used to repurchase factored accounts receivable of The Mills Company, to pay creditors of the company and employee salaries and to provide some working capital. Petitioner guaranteed this loan in a letter to the President of Poudre Valley in which he stated: In consideration of your bank's loaning $150,000, at no more than 6% simple interest, to the Mills Co., Inc., with my brother, Russell Bugas, and Winston Mills as co-signers of a promissory note evidencing such loan, I hereby guarantee payment in full thereof at maturity date, or any extension thereof to which I agree at the time of such extension. The 1964 note called for annual payments of $30,000 plus interest with the first payment due on November 13, 1965. The Mills Company, however, was only able to pay $10,000 of the first installment. The due date for the $20,000 balance *387 was extended until May 1966 but no further payment on the note was made. An officer of Poudre Valley wrote to petitioner advising him that The Mills Company was in poor financial condition and calling on petitioner to honor his guarantee. In response to the bank's request for payment, on September 30, 1966, petitioner paid the bank $28,400 as the past-due portion on the note plus accrued interest. Russell then executed a promissory note in favor of his brother in the same amount. On November 24, 1967 a new note (1967 note) in the amount of $107,167.99 was executed to reflect the balance due on the 1964 note. The 1967 note carried a new interest rate of 7 percent to which petitioner gave his written consent as guarantor. The 1967 note read as follows: Fort Collins, Colorado, November 24, 1967. November 24, 1968 After Date, the undersigned or either of us Promise to Pay to the Order of THE POUDRE VALLEY NATIONAL BANK, One Hundred Seven Thousand One Hundred Sixty Seven and 99/100 Dollars. * * * THE MILLS COMPANY, INC. /s/ Russell L. Bugas The 1967 note called for minimum monthly payments of $1250 per month. The note also had a one-year term in order to give the bank more flexibility *388 in calling the loan if progress toward payment remained unsatisfactory. The 1967 note was carried as a liability on the books and records of The Mills Company. Payments on the note, other than payments made by the petitioner, as guarantor, were made by the corporation on corporation checks drawn on corporation checking accounts. While Russell was also personally liable on the note, The Mills Company was the primary obligor. It was the practice of Poudre Valley to require personal liability on the part of principals in small closely held corporations. Poudre Valley listed the loan on its receivable ledger under the name "The Mills Company, Inc." The words DIRECT LIABILITY appear at the top of the ledger. The Mills Company continued to have financial difficulties and the corporation did not generate sufficient income to keep the loan current. On October 9, 1968, petitioner forwarded to the bank $25,000 to be deposited in a checking account in petitioner's name with authorization to the bank to withdraw from the account amounts to pay past due monthly installments on the loan. Payments of monthly installments by The Mills Company ceased in October 1968 and from November 1968 through *389 April 1969, petitioner's account at the bank was charged for the monthly payments of principal and interest and for accountants' services. In 1968 petitioner's account was charged $965 for accountants' services and $2500 for the November and December installments of principal and interest. Another $3,750 was charged to petitioner by the bank for three monthly installments falling due in 1969. Finally, on March 19, 1969, Poudre Valley advised petitioner by letter that the loan would be called. On May 23, 1969 Poudre Valley closed out the balance of petitioner's checking account in the amount of $17,785 and applied such amount to the loan. Three days later, petitioner forwarded an additional $7,215 to the bank to be applied on the loan balance. Finally, on December 22, 1969 the bank acknowledged receipt from petitioner of $72,918.37 in full payment of the balance due it. In 1969, Louis E. Gelt, a Colorado attorney representing Russell Bugas and The Mills Company, liquidated the company's assets and arranged to pay its unsecured general creditors, other than petitioner, on a pro rata basis between 50 and 60 percent of their claims in exchange for releases of their claims against the *390 company and Russell Bugas. This arrangement with creditors was made possible by petitioner's forebearance from asserting his $129,693.19 claim against such assets. Had petitioner asserted his claim against such assets, he would have been entitled to receive therefrom $8,313.33 and the other general creditors would have been entitled to receive only about 6 percent of the value of their claims on a pro rata basis. On their joint returns for 1968 and 1969, petitioner and his wife took deductions of $31,865 and $97,307, respectively, describing each as a "bad debt loss, guarantor of noncorporate obligation." OPINION The issue for decision is whether the sums paid by petitioner as guarantor are deductible as bad debt losses under the provisions of section 166(f). [3] In order for a payment to be deductible under section 166(f), [4] the following requirements must be met: (1) The guarantor must not be a corporation, (2) the debt obligation must not be that of a corporation, (3) the proceeds of the loan must be used in the trade or business of the borrower, and (4) the debt must have been worthless as between the borrower and the lender at the time the guarantor makes good his guarantee. *391 Respondent's primary argument is that the petitioner made his guarantee on a corporate obligation. Petitioner, on the other hand, argues that the guarantee was made on the personal obligation of his brother, Russell Bugas. The principal point of contention is therefore whether or not the 1967 note on which petitioner made his payments as guarantor, was a corporate or noncorporate obligation. *392 We are convinced by the record that petitioner guaranteed a corporate debt. The facts indicate quite clearly that each of the loans by Poudre Valley was made to The Mills Company and not to Russell Bugas individually. Poudre Valley made its first loan to The Mills Company late in 1963. Each subsequent advance was recorded on the bank's loan ledger under the name "The Mills Company." Payments on these loans, including all of those made by petitioner as guarantor, were likewise credited to the account designated on the loan ledger as The Mills Company. The 1967 note did not represent the advance of any new proceeds, but merely reflected the balance in The Mills Company account at the time the note was made. While The Mills Company's financial difficulties necessitated a change in the terms of the outstanding note, the loan balance was continuously carried on The Mills Company account. None of the loans pertinent to this case were carried under the name Russell L. Bugas. The payments on the 1967 note, other than those made by petitioner, were made by The Mills Company from its corporate checking account and the 1967 note and its predecessors were carried as liabilities on the corporate *393 books. The nature of petitioner's guarantee also suggests the existence of a corporate obligation. All of the guarantees made by the petitioner in connection with loans to The Mills Company consistently show that The Mills Company was considered to be the recipient of the loans. Petitioner stated that his guarantee on the 1964 note was made in consideration of the bank's lending $150,000 "to The Mills Co., with my brother Russell Bugas and Winston Mills as cosigners." Since the 1967 note was a continuation of the earlier note, no new guarantee was made, and petitioner merely acquiesced in the changed terms. Petitioner argues that the 1967 note was solely the personal obligation of Russell and therefore did not evidence a corporate obligation. In making this argument, petitioner contends that Russell signed the note individually rather than in any representative capacity. Assuming Russell was personally liable on the 1967 note, [5] we are nevertheless satisfied that the corporation was also liable thereon, and that the note therefore was a corporate obligation. *394 Colorado Revised Stat. Ann., section 155-3-118(e)(1963) provides: (e) Unless the instrument otherwise specifies, two or more persons who sign as maker, acceptor, or drawer or indorser and as a part of the same transaction are jointly and severally liable even though the instrument contains such words as "I promise to pay." Section 155-3-401(2) further provides: "A signature is made by use of any name, including any trade or assumed name, upon an instrument, or by any word or mark used in lieu of a written signature." The comments to this section note that "A signature may be handwritten, typed, printed or made in any other manner." [6] [Emphasis added.] Under Colorado's Uniform Commercial Code provisions, therefore, both Russell and The Mills Company are liable on the note. See Perez v. Janota,107 Ill. App.2d 90, 246 N.E.2d 42 (1969); O.P. Ganjo, Inc. v. Tri-Urban Realty Co.,108 N.J. Super. 517, 261 A. 2d 722 (1969) also arising under the Uniform Commercial Code. This joint liability is further evidenced by *395 the first line which states in pertinent part: "the undersigned or either of us Promise to Pay." (Emphasis added.) This language assumes that more than one party is liable on the note. Since Russell was the president and sole shareholder of The Mills Company, it is reasonable to conclude that the other party was the corporation whose name appears on the note just above Russell's. We do not consider the quoted language to be mere surplusage. In addition to the evidence on the face of the note, we think it appropriate to examine the surrounding facts and circumstances in determining whether the corporation was liable on the 1967 note. Cf. Colorado Revised Stat., Section 155-3-403 (1963), Official Comment No. 3. Petitioner concedes that The Mills Company was liable on the 1964 note. [7] The 1967 note merely reflected the balance then due on the 1964 note. While the terms of the note were changed somewhat because of lack of progress in paying the underlying debt, there was no indication that the corporation had been relieved of its liability on the note. Poudre Valley's loan account for The Mills Company remained unchanged, except for a notation that the note evidencing the liability *396 had been rewritten. No new guarantee was executed and no change in the source of payment was made. In its correspondence, Poudre Valley continued to refer to the loan as one owed by The Mills Company. Finally, we believe the issue of liability on the note must be considered in its historical context. The 1967 note is the culmination of a series of loans made to the corporation and guaranteed by petitioner. These loans were consistently treated as corporate obligations. Aside from the lack of any corporate designation after Russell's signature on the 1967 note, there is no evidence in the record suggesting that this liability was treated any differently than its predecessors. Having decided, therefore, that the corporation was liable on the 1967 note, the fact that Russell was also liable thereon, does not transform the note into a personal obligation. It is not at all unusual for banks making loans to small, *397 closely held corporations to require the personal liability of its major shareholders. Indeed, such was the practice of Poudre Valley here. Such requirements do not make the executed notes any less of a corporate obligation. We hold that petitioner's guaranteed payments were made in discharge of a corporate obligation, and therefore, fall outside the ambit of section 166(f). Petitioner makes the additional argument that the corporate form should be ignored since Russell ran the business like a sole proprietorship. We cannot, however, ignore the existence of the corporate identity. Moline Properties, Inc. v. Commissioner,319 U.S. 436 (1943). Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
2. During all of the years involved in this case, Russell was employed as an officer of The Mills Company. His salary during these years averaged about $225 per week. The Mills Company was his sole source of income.↩
3. If these payments are deductible under sec. 166(f), they will be treated in the same manner as business bad debts. Respondent has conceded that if sec. 166(f) is inapplicable, petitioner will be entitled to deduct his payments as nonbusiness bad debts, which are treated as shortterm capital losses. Petitioner acknowledges that he is only entitled to nonbusiness bad debt treatment for his $28,400 payment on the 1964 note. In addition, petitioner can not deduct as a bad debt the $8,133 which he chose to forego so that his brother could reach a settlement with The Mills Company creditors. ↩
4. (f) GUARANTOR OF CERTAIN NONCORPORATE OBLIGATIONS. -- A payment by the taxpayer (other than a corporation) in discharge of part or all of his obligation as a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as a debt becoming worthless within such taxable year for purposes of this section (except that subsection (d) shall not apply), but only if the obligation of the borrower to the person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment.↩
5. There is little doubt that Russell became liable on the 1967 note. Colorado Revised Stat. Ann., Sec. 155-3-403(2)(1963) provides: (2) An authorized representative who signs his own name to an instrument: * * *
(b) Except as otherwise established between the immediate parties, is personally obligated if the instrument names the person represented but does not show that the representative signed in a representative capacity, or if the instrument does not name the person represented but does show that the representative signed in a representative capacity. See also Official Comment, Paragraph 3.↩
6. As president and sole shareholder, Russell had the authority to sign the corporate name, and to establish its liability.↩
7. See also New England Electric Co. v. Shook, 27 Colo. A. 30, 145 P. 1002 (1915); St. Vrain Development Co. v. F. & S. Development Co., Colo. App., 470 P. 2d 49 (1970); MacKay v. Lay, Colo. App., 470 P. 2d 614↩ (1970).